UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:16 CR 35 RLW (ACL) |
| | ) |
| JULIUS LAMON JONES, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Pending before the undersigned is Defendant Julius Lamon Jones' Motion to Suppress Evidence and Statements. (Doc. 27.) Jones argues that an officer did not have reasonable suspicion to justify a *Terry* stop of the Cadillac Escalade in which he was a passenger based on an anonymous 911 tip. Jones requests the suppression of "all items seized from [his] Cadillac Escalade, all testimony regarding [his] seizure and arrest from the Escalade, and any statements [he] allegedly made at the scene of his arrest." *Id.* at 4. The Government filed a Brief in opposition to Jones' claims. (Doc. 32.) After an evidentiary hearing (Doc. 37), both parties submitted memoranda. (Docs. 45, 47.)

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that Jones' Motion to Suppress be denied.

## I.  Findings of Fact

The investigation of this case began with a grocery store robbery being reported to police.  One person was shot during the robbery. Three suspects fled in a car from the grocery store.  A high speed chase from Kennett, Missouri to Blytheville, Arkansas followed.  Within just over an hour, the chase resulted in the arrests of two of three suspects who were in the car.  One of the suspects was arrested just minutes after the car crashed in a field in Blytheville.  Another suspect was arrested in Osceola, Arkansas after a 911 caller reported the suspect had gotten into a Cadillac Escalade and departed the area.

The apprehension of the suspects required communication and cooperation between multiple law enforcement agencies, including:  the Kennett Police Department in Missouri; the Missouri State Highway Patrol; the Mississippi County, Arkansas Sheriff's Department; the Arkansas State Police; and the Osceola, Arkansas Police Department.

On July 1, 2015, around 10:00 p.m., Sgt. Phillip Caldwell of the Kennett Police Department received a dispatch regarding an armed robbery at Curt's Grocery.  One person was shot during the robbery and the suspects left in a silver Toyota passenger car.  Sgt. Caldwell responded to the call by activating his lights and siren, and traveling toward Curt's Grocery.  While en route, Sgt. Caldwell passed a silver Toyota in oncoming traffic.  He turned around to follow the Toyota and a high speed chase ensued.  Although Sgt. Caldwell chased the suspect vehicle at speeds exceeding one hundred miles per hour, the Toyota would not stop.

When Sgt. Caldwell was within eight car lengths of the Toyota, he heard noises and saw muzzle flashes coming from the driver's side of the vehicle. He realized the flashes were gun shots. Sgt. Caldwell backed off slightly from the Toyota, but followed it all the way to Blytheville, Arkansas where a Mississippi County Deputy, Dale Stracener, took the pursuit over at approximately 10:18 p.m.

Initially, roughly one mile inside the Arkansas state line, Deputy Stracener had his patrol unit parked so that it was blocking the highway with the emergency lights on. As the Toyota approached Stracener's location, the Toyota slowed to approximately sixty or seventy miles per hour and passed the patrol car by driving on the grass shoulder of the highway. After passing the parked patrol unit, additional shots were fired from the Toyota toward the patrol car. Deputy Stracener began to pursue the Toyota, driving at speeds in excess of one hundred miles per hour.

Law enforcement officers followed the Toyota into Yarbrough, Arkansas during which time additional shots were fired by the front passenger occupant of the Toyota. Sgt. Caldwell continued behind the Arkansas officer until the pursuit terminated in Blytheville, Arkansas. The Toyota was driven into a grassy field and crashed nose first in a ditch approximately 250 feet off the roadway.

Deputy Stracener observed three suspects bail out of the Toyota--the driver, who was wearing red, out of the driver's side; and two passengers out of the passenger side. One passenger was wearing gray sweat pants and the other passenger was wearing a white sleeveless t-shirt, or what was also referred to as a "wife beater." The three suspects were African-American men. They ran to the northeast, away from the wrecked

Toyota.  Within a few minutes, Deputy Stracener along with Trooper Bennett of the Arkansas State Police found the driver lying down in some nearby bushes.

Deputy Stracener recalled that while working with Trooper Bennett to find the suspects, he overheard a radio transmission regarding a black male wearing a white tank top and dark pants getting into a mustard-colored Cadillac Escalade with an Arkansas license plate.  Deputy Stracener testified that the radio traffic as he recalled it was "a black male wearing the same description as I had said earlier, white tank top, dark pants, on the scene getting into a Cadillac Escalade."  (Suppression Hearing Transcript, Doc. 37 at 25, hereinafter "Tr. ___".)  Deputy Stracener believed the information had come from a 911 caller,[1] however, he could not verify the source of the information other than to say it was relayed by the Mississippi County Sheriff Office's Dispatcher.

Around 10:30 p.m., Osceola Police Department (OPD) Officer Chris Ellis was on patrol and heard radio traffic regarding one of the suspects from the Missouri robbery.  Osceola is located twenty-five to thirty miles from the Missouri/Arkansas state line.  The OPD Dispatcher[2] reported that the Mississippi County Sheriff's Office advised they received a 911 call that an occupant of a vehicle from the officer involved shooting "had

---

[1]  The Government reported that by the time the instant Motion to Suppress was filed, a recording of the 911 call was no longer available as it had been written over on the Mississippi County Sheriff Office's recording system.  (Tr. 59.)  The instant Motion was filed more than one year after the incident.

[2]  Officer Ellis explained that the OPD Dispatcher uses a legal pad to write notes regarding incoming calls and radio traffic.  That written information is later entered into a computer system.  The Government submitted the Arkansas State Police's "Radio Transmission Log Form" as Government Exhibit #1.  The Government explained that the Arkansas State Police log and recording (Gov't. Ex. #3) were the only records available regarding the radio traffic and 911 call when the instant suppression motion was filed.  (Tr. 59.)

gotten into a mustard yellow Cadillac Escalade" (Tr. 29), with a specific Arkansas license plate number (LPN). (Tr. 29-31, 41-43.)

At approximately 10:43 p.m., one of the recorded Arkansas State Police dispatches reveals that the following information was called out by the Operator:

> I was going to give you a little traffic. I was listening to Mississippi County, they advised that a green Cadillac Escalade, Arkansas LPN 685 Sam Nora Nora, 685 Sam Nora Nora, possibly picked up one of the suspects; wearing a wife, uh, a wife beater shirt and dark jeans, uh, black male; unknown direction of travel.

(Gov't. Ex. 3 at 21:10 thru 21:35.[3]) Shortly thereafter, the Operator called out to another officer, "You don't see a green Cadillac Escalade anywhere, do you?" *Id*. at 22:09. The officer answered, "Negative, I've been looking." *Id*.

At 10:56 p.m., Officer Ellis and Patrolman Newel were waiting at the north end of the Osceola city limits to watch for a mustard yellow Cadillac Escalade and the Cadillac came into view. Officer Ellis followed the Cadillac through town and stopped it in the parking lot of an old gas station. The driver was Defendant Julius Jones' wife, Reshawn Jones. Jones was in the front passenger seat wearing a white sleeveless t-shirt that had blood on it and black sweat pants. The back side of Jones' sweatpants and his shoes had fresh mud on them.

Around 11:00 p.m., an Arkansas Trooper (identified as "C2" in the radio log) reported "Update just received on the, uh, a green Escalade, that's. . .from around this

---

[3] The following typed entry was made in the computerized Arkansas State Police "Radio Transmission Log Form": "10-19 to Miss Co. information from Miss County adv AR685SNN could have picked up a suspect mustard Cadillac SUV." (Gov't. Ex. 1 at p. 2, time entry at 1043.)

area. . .has just been located in Osceola." *Id*. at 26:00. The Arkansas State Police "Radio Transmission Log" entry reflected ". . .The mustard green Escalade [had] been seen in Osceola Arkansas 10-97 in Miss Co." (Gov't. Ex. 1 at p. 2, time entry at 1059.)

After Jones was directed to exit the Cadillac, he was arrested. Without being asked any questions, Jones stated that he hadn't done anything—that he was coming from Kennett where he had been gambling.

Officer Ellis testified that he would not have stopped the Cadillac in which Jones was a passenger if the Mississippi County Sheriff's Office had not dispatched a request for a mustard yellow Cadillac Escalade with Arkansas license plate number 685SNN to be stopped.

## II. Conclusions of Law

The undersigned concludes that Officer Ellis had reasonable suspicion to stop the Cadillac. As a result, the stop of the Cadillac was lawful and all the evidence seized following the stop is admissible at trial.

**II.A. The Stop of the Cadillac Escalade was a valid *Terry* stop.**

Jones summarized the "single issue" raised in his Motion to Suppress and the facts he believes are relevant as follows:

> Officers with multiple agencies from Missouri and Arkansas pursued a vehicle fleeing with suspects from a robbery. The fleeing vehicle crashed and the suspects ran from the crash scene. A little later, police heard information over the radio about a "mustard yellow" Cadillac Escalade with a specific license plate driving away with one of the possible suspects. Given that no officer knows where the information about the Escalade came from, did the police have reasonable suspicion to stop Defendant's vehicle?

(Doc. 59 at 4.) Jones asserts the officers did not have reasonable suspicion to justify the stop.

This case involves a combination of police officer observations of suspects involved in clearly criminal activity (evading officers at speeds in excess of one hundred miles, shooting at police officers, and leaving the scene of an accident), along with a 911 caller's report concerning a perceived suspect's actions to evade capture by authorities after the Toyota crashed. In light of these circumstances, it is important to note that Eighth Circuit cases:

> are replete with situations in which one officer furnishes information to another, and while this frequently involves two officers from the same police force, it may also involve an officer in one locality communicating with one in another. In an era when individuals can fly thousands of miles in a matter of hours, we should not place undue restrictions on the ability of officers in one city to pass vital information on to officers in another city. An individual arousing suspicion as he or she departs on an airplane should not find it surprising that those suspicions can be transmitted to officers in the destination city.

*United States v. Riley*, 927 F.2d 1045, 1049 (8th Cir. 1991). While *Riley* addressed the sharing of information by law enforcement agencies related to a suspect who travelled by air, the same reasoning applies to an individual travelling by car.

In *Riley*, the Eighth Circuit summarized findings related to a similar scenario that was examined in *United States v. O'Connell*, 841 F.2d 1408 (8th Cir. 1988),

> That case involved an officer who stopped a car and detained its occupants although he was not personally aware of the significance of the specific make of car, or able to identify the driver. *Id.* at 1418. Other officers on the investigation team knew about the significance of the make of car and also were able to identify the driver as a suspect in their criminal investigation. *Id.*

> [O'Connell] argued that the officer who stopped and detained the automobile violated [his] fourth amendment rights because that officer did not have sufficient personal knowledge to constitute probable cause or reasonable suspicion. *Id.* at 1418–19. We rejected that argument, holding that "we presume that the officers have shared relevant knowledge which informs the decision to seize evidence or to detain a particular person, even if the acting officer is unable to completely and correctly articulate the grounds for his suspicion at the time of the search." *Id.* at 1419 (citing *United States v. Wright,* 641 F.2d 602, 606 (8th Cir.), *cert. denied,* 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981); *White v. United States,* 448 F.2d 250, 254 (8th Cir.1971), *cert. denied,* 405 U.S. 926, 92 S.Ct. 974, 30 L.Ed.2d 798 (1972)).

*Riley*, 927 F.2d at 1049.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures..." U.S. Const. amend. IV. In *Terry v. Ohio*, 392 U.S. 1, 30 (1968), the Court held that an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion based on his experience that criminal activity is afoot. *See also United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999) (An investigative stop of a vehicle "does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants are involved in criminal activity."). There is no requirement that there be a traffic violation. *See Alabama v. White*, 496 U.S. 325 (1990) (upholding stop of vehicle in absence of traffic violation).

The level of suspicion required to justify a stop is "considerably less than proof of wrongdoing by a preponderance of the evidence" and must be evaluated under "the totality of the circumstances." *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989). Reasonable suspicion is a particularized and objective basis for suspecting the person

stopped of criminal activity.  *United States v. Thomas*, 249 F.3d 725, 729 (8th Cir. 2001).  Whether there is reasonable suspicion to justify a *Terry* stop depends upon the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop.  *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002).  "Reasonable suspicion is based on 'specific and articulable facts,'" *Terry*, 392 U.S. at 21, which are considered collectively and "in light of the significance that a law enforcement officer experienced in detecting criminal activity would attach to them." *United States v. Quarles*, 955 F.2d 498, 501 (8th Cir. 1992) (citing *United States v. Turpin*, 920 F.2d 1377, 1385 (8th Cir. 1990)).  "The 'reasonable suspicion' necessary to justify [a *Terry*] stop is dependent upon both the content of the information possessed by the police and its degree of reliability.'"  *Navarette v. California*, 134 S.Ct. 1683, 1687 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1999)).  "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in their totality."  *United States v. Tutley*, 161 F.3d 513, 515 (8th Cir. 1998) (per curiam).

"Because reasonable suspicion is a less demanding standard than the probable cause required for an arrest, it 'can arise from information that is less reliable than that required to show probable cause…'"  *United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).  "A tip from a known informant can suffice by itself to establish reasonable suspicion" for a *Terry* stop, even if the police do not corroborate the tip prior to the stop with their own independent observation." *United States v. Spotts*, 275 F.3d 714, 720 (8th Cir. 2002) (citing *Adams v.*

*Williams*, 407 U.S. 143, 146-47 (1972)). "An anonymous tip can also provide reasonable suspicion by itself, but only if it is sufficiently corroborated at the time of the stop." *Id*. (interim citations omitted).

Generally, 911 calls may provide an officer with reasonable suspicion to conduct a *Terry* investigative stop. *United States v. Terry*, 400 F.3d 575, 580 (8th Cir. 2005) (911 caller reported a man in a yellow pickup was causing a disturbance at a particular location, when officers arrived they had reasonable suspicion to approach the defendant who was seated in a yellow pickup on the property). This is particularly so where the 911 caller has personally and recently observed the possible criminal offense. *See Navarette*, 134 S.Ct. 1689 (reliability factors for tip from 911 caller included: the caller claimed eyewitness knowledge of allegedly dangerous activity (drunk driving), the caller's statement was made "soon after perceiving the event," rendering it "especially trustworthy," and the call was made through the 911 system, which "has some features that allow for identifying and tracing callers,. . .provid[ing] some safeguards against making false reports").

In *United States v. Juvenile TK*, 134 F.3d 899 (8th Cir. 1998), reasonable suspicion was found where officers stopped a "gray vehicle" less than two blocks from the location of where a man had been seen brandishing a weapon five minutes earlier. Forty minutes earlier the officers heard a dispatch regarding an incident involving a man breaking out a car window and then getting into a "gray vehicle." Five minutes after the gun brandishing incident, two officers observed a "gray vehicle" two blocks from where the man reportedly brandished a weapon. They turned around to follow the "gray vehicle"

and turned on the patrol car's red lights. When they did so, the "gray vehicle" made a quick turn and accelerated but did not commit any traffic violations. The Eighth Circuit found that an analysis of the "temporal and geographic proximity of [a getaway car] to the scene of the crime, the matching description of the vehicle, and the time of the stop," may support a finding of reasonable suspicion. *Juvenile TK*, 134 F.3d at 903. *See also U.S. v. Quinn* 812 F.3d 694 (8th Cir. 2016) (affirming denial of suppression motion where officers stopped defendant roughly forty minutes after officers saw suspects flee the crime scene and within a few blocks of the wreck of the stolen car).

Jones argues that "it is entirely unclear what the [911 caller. . .] told police about the Cadillac Escalade other than the color and license plate." (Doc. 45 at 5.) Furthermore, he suggests that the information about what the occupant of the Cadillac was wearing did not come from the 911 caller rather that information "was derived from a substantial amount of dispatch radio chatter which included police descriptions of fleeing suspects." *Id*. at 3-4. The undersigned credits Deputy Stracener's recollection that when he heard the Mississippi County Sheriff's Dispatcher call out information regarding one of the suspects entering a Cadillac Escalade, the information included that a black male suspect was wearing a white tank top and dark pants. Deputy Stracener was in a unique position to recall the details of the dispatch as he witnessed, firsthand, the clothing of all the suspect's that fled from the crashed Toyota. After having observed a black male wearing a white tank top and dark pants flee from the crashed Toyota it would be particularly noteworthy to hear a dispatch that a 911 caller reported a person matching that description had gotten into a Cadillac Escalade with an Arkansas license plate.

Furthermore, one of the Arkansas State Police dispatch recordings reflects that this exact report was made by an Arkansas State Police Operator regarding the Mississippi County dispatch. *See* Gov't. Ex. 3 at 21:10 thru 21:35. The Operator reported:

> I was going to give you a little traffic. I was listening to Mississippi County, they advised that a green Cadillac Escalade, Arkansas LPN 685[SNN], possibly picked up one of the suspects; wearing a wife, uh, a wife beater shirt and dark jeans, uh, black male.

*Id*.

In this case, Officer Ellis' stop of the Cadillac was not based on the anonymous tip alone,[4] but in combination with the reported observations of other officers. Those observations included multiple officers participating in the high speed chase of the three suspects from Missouri to Arkansas, officers being shot at by the suspects during the pursuit, as well as witnessing the suspects fleeing from the crashed Toyota and what the men were wearing. Those observations along with the 911 caller's report that one of the suspects (the one wearing a white sleeveless t-shirt and dark pants) had entered a Cadillac Escalade with Arkansas license plate number 685SNN, fueled the need for the Cadillac to be stopped. Without regard to whether the 911 caller reported that the Cadillac was

---

[4] The cases Jones relies upon to support his position—*Navarette v. California*, 134 S.Ct. 1683 (2014) and *Florida v. J.L.*, 529 U.S. 266 (2000)—involve vehicles being stopped based solely on information provided by anonymous tipsters. (Doc. 47 at 8-9.) That is not the factual scenario in the present case. As the Government acknowledged, "if the only information that the officers had about Jones was the information gathered from the anonymous tip, there would not have been sufficient information to suspect that the Escalade was involved in criminal activity." (Doc. 47 at 9.)

mustard colored, mustard yellow, or green, the most significant details were the make and model of the vehicle, and the exact license plate number.[5]

The undersigned finds that Officer Ellis had reasonable suspicion to stop the Cadillac. He received information from the Osceola Police Department Dispatcher that officers from the Mississippi County Sheriff's Department, the county in which Osceola is located, had been in pursuit of a Toyota that was shooting at law enforcement officers. He also knew that the occupants of the Toyota fled that vehicle when it crashed and that a 911 caller reported that one suspect had gotten into a Cadillac Escalade with Arkansas license plate 685SNN. A total of approximately thirty-nine minutes passed from the time the man with the white sleeveless t-shirt and dark pants ran from the Toyota that crashed in Blytheville until Jones was stopped in the Cadillac in Osceola. When officers were situated at the outskirts of Osceola on the lookout for the potential arrival of the Cadillac from Blytheville, they spotted the vehicle. The Cadillac that appeared in Osceola was the same model and had the same license plate as reported by the 911 caller. Although the color the 911 caller attributed to the Cadillac is uncertain, that is of no consequence based on the other unmistakable details that were provided—the make, model, and license plate

---

[5] In this case, at least one segment of the radio log transmissions reflects that the dispatcher wrongly stated that the Cadillac Escalade with the specific license plate number was green when the Cadillac was in fact mustard yellow, or mustard colored or yellow. The officers, however, were entitled to rely on the information provided by dispatch, even if erroneous. *United States v. Watson*, No. 2:15-CR-79, 2016 WL 4578152, at *6 (N.D. Ind. Sept. 2, 2016). *See United States v. Mounts*, 248 F.3d 712, 715 (2001) ("Whether or not the officers were given faulty (inaccurate) information...is immaterial to the case because police officers are entitled to rely on the reasonable information relayed to them from a police dispatcher.") (citing *United States v. Hensley*, 469 U.S. 221, 231 (1985)).

number.  The "temporal and geographic proximity" of the second getaway vehicle (the Cadillac Escalade) in Osceola to the location of the Toyota crash in Blytheville, along with "the matching description of the vehicle, and the time of the stop," support a finding of reasonable suspicion.  *See Juvenile TK*, 134 F.3d at 903.

   Officer Stracener's observations of the suspect in a white sleeveless tank shirt with dark pants running from the crashed Toyota that had been involved in criminal activity (speeding from law enforcement at speeds exceeding one hundred miles per hour, shooting at officers, and leaving the scene of an accident) in combination with the 911 caller's report regarding a man wearing those same clothes entering the Cadillac Escalade after the crash, provides sufficient corroboration of the 911 call to warrant a *Terry* stop.  As a result, whether the 911 caller was aware of specific unlawful activity by the man who got into the Cadillac is of no consequence.

   The record here supports that Officer Ellis' stop of the Cadillac was justified.  As the Supreme Court emphasized in *Terry*, "it is imperative that the facts be judged against an objective standard:  would the facts available to the officer at the moment of the seizure or search 'warrant a man of reasonable caution in the belief' that that the action taken was appropriate?"  *Terry*, 392 U.S. at 21-22.  Under the circumstances present in this case, the only appropriate action was for Officer Ellis to stop the Cadillac Escalade with Arkansas license plate number 685SNN.  The Court finds the stop of Jones' Cadillac was according to law and constitutional.

**II.B. Fruit of the Poisonous Tree**

Jones also requests suppression of "all items seized from the Escalade, and any observations of [him] and his clothing" (Doc. 27 at 2), and statements he made to law enforcement officers following the alleged unlawful stop, *id*. at 3. He argues that the seizure of that evidence was the result of the alleged unlawful *Terry* stop.

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *Segura v. United States*, 468 U.S. 796, 804 (1984). In addition, "[v]erbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002), citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

In this case, because the stop of the Cadillac did not violate Jones' constitutional rights, his statements, the observations of the officers, and the items seized from the vehicle were not fruit of the poisonous tree. *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013).

Jones did not argue that his statements were involuntary or that there was a violation of *Miranda v. Arizona*, 384 U.S. 436, 448-450 (1966), so those issues are not considered. Jones' Motion to Suppress Statements should be denied.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Jones' Motion to Suppress Evidence and Statements (Doc. 27) be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

s/Abbie Crites-Leoni
United States Magistrate Judge

Dated this 8th day of December, 2016